Good morning, everybody. We're here today for the very first day of our 23-24 term. I understand it's the 132nd year that this court has been hearing cases as the Seventh Circuit. Before that, it was something else. So, Counsel, you have the honor of presenting the first case of the year. We're going to begin with appeal numbers 23-1528 and 23-1530, United States v. Pacilio and Bases. We're going to begin with Mr. Loeb. May it please the Court, Robert Loeb for Appellant John Pacilio. I'm sharing time with Mr. Allen, who's representing Mr. Bases, and we'll be dividing the time for the opening ten minutes of six minutes and trying to save four minutes for rebuttal. I'm going to address the due process fair notice argument and the fraud conviction. Mr. Allen's going to be addressing the prejudicial trial error of allowing improper lay testimony. In its brief on appeal, the government concedes that the due process fair notice issue is a matter of first impression for this court and that, contrary to the position that it took in the district court, that it is not controlled by COSHA or CHNU and must be decided here for the first time on appeal. Given that admission, with your court's permission, I'm going to start with the due process fair notice argument. This court has held that the due process fair notice issue is one of law and has explained that it is an objective test. This court explained in Harris that the inquiry is whether, at the time of the conduct at issue, the application of the law to a particular circumstance was objectively ambiguous. This court says if it is objectively ambiguous, then the law fails to provide the fair notice that is required. This court and the Supreme Court have said that that standard is very similar to the qualified immunity, clearly established law standard that applies when you sue government officials. You look as to whether a reasonable objective, reasonable officer would have known that his conduct was unconstitutional. And here we have to look at whether a reasonable objective trader would have known the conduct here was criminal fraud. And here at the time… Mr. Lobes, does your argument here apply to both wire fraud and the commodities fraud statute? It does, Your Honor. How do you get around that the Supreme Court, our circuit, has long recognized that omitting material information or providing half-truths have long been considered fraud? Right. This court has always looked at this as to the application to the particular circumstance. So the question is, was it clearly established at the time that the conduct here of trading, whether you frame it as the government does, as trading with an intent to cancel, or as the indictment does, trading, making the statement… Do you agree that it's long been recognized that omitting material information for your own benefit is a theory of fraud? Certainly it is a theory of fraud. And the question is, would a reasonable trader believe that trading with an intent to cancel, as the government frames it, was depriving the market of material information, would it be considered fraud? And at the time of the actions here, if you look at all the material that was before an objective reasonable trader, it was an objectively reasonable position to believe it was not fraud. Let me just tick through a few things a person would have known at the time. At the time, the district court and the Fifth Circuit sitting in bank in Radley said that even if a trade is placed with no intent to actually enter into a transaction, that's in the Fifth Circuit opinion, it is not fraud if the bids were in fact at risk of being executed. And the district court, which was affirmed by the in-bank court, explained, since the defendants were willing and able to follow through on all bids, they were not misleading. So it was not a material misstatement. So it was not to be considered fraud. So a reasonably objective trader, knowing the Radley decision… Whereas here they didn't. Here there were some trades which were executed and some were not, just as in Radley? No, no, no. The theory of the fraud here is that the trades, there were trades placed that were put out, there were buys put out that they fully intended to execute, and then they put out these what I'll call spoofing orders on the other side that they did not intend to execute, that instead those were intended to manipulate the market in the direction to make the first one more profitable. That's what the theory has been. And in Radley it was different because the traded issue was actually executed, or the product was impacting the market, was actually purchased, where here that's not what the theory was. No, there were multiple bids made in Radley, and if you look at the Fifth Circuit opinion it says those were placed without the intent to execute those trades. But let me, I think your point is, one, that they're making a false appearance to the market about these trades. The standard that even the CME said in its letters after Dodd-Frank was enacted, and this is really important, at pages 61 and 70 of the appendix you have these letters from the CME to the CFTC, and they're trying to explain what is a spoofing order that should be prohibited, because the CFTC has asked the parties, the players all for their views on that. And they said in their letters, this is the CME talking, that if a bid or offer can be executed before withdrawing, it is a live offer and it does not create a false appearance of market debt. That's in both those letters from May and January of 2011, because they are actionable until they're withdrawn. So the CME is telling you there is no fraudulent misstatement. No doubt the CME didn't want this practice because they said it was a disruptive practice, it wasn't good behavior, but they said it was not sending a false appearance of market debt, that's a quote from the letters, to the market. And that's the whole theory of the government here. So the question is, could a reasonable trader, seeing these letters from the CME saying this is not a fraudulent statement, knowing that the CME standard defining what an offer and a bid is, turns on willingness to have the trade executed and that if it does, you will fulfill your obligations. Under that theory, though, Mr. Loeb, there would be no convictions under CHNU. Well, this is a temporal analysis. We're not arguing – CHNU was years after the fact here. So certainly a reasonable trader after the CHNU decision doesn't engage in this behavior because CHNU said, oh, that's fraudulent. But even if we take the facts of CHNU and we overlay it on that theory, there would be no conviction, right? They didn't make this due process argument there, as the government admits. I understand they didn't make it. I'm just saying if we take your theory to the logical consequence, it wouldn't have resulted in a conviction in cases which have been affirmed. That is most likely. The facts of these cases are a little bit different. But yes, that is. And the indictment there is different. Here there's the indictment about wanting versus willing. But yes, I think that is – But that's not – there's one paragraph in this indictment that talks about willing. But essentially the other allegations in this indictment are essentially the same as CHNU and COSIA. I'd like to get to that, but I think just focusing on the fair notice argument. You have to look at both everything the trader knew. So you have the Radley decision saying that if it's an active trade, it can be traded. Can you address when you're addressing what the trader knew pre-Dodd-Frank all of the guidance about manipulating the market? So there were CME rules and regulations about market manipulation. True, it didn't use the word spoofing. True, it didn't talk about the specific things that Paseo and Basie's did. But there was guidance about taking actions to manipulate the market. There were general statements and CME rules about market manipulation. This is not a market manipulation case. There are separate statutes addressing it. There are separate rules regarding it. This is a criminal fraud case where the whole case is premised on that you are making a false statement to the market. In order to manipulate it. In order to manipulate it, the false statement sort of all turns on that you are representing to the market the false order. And that we have at the time of the action here, we have the CME before and during this action are writing letters to the CFTC saying, no, these are not fraudulent orders. They're not misrepresentations to the market of market depth. You have the Fifth Circuit and Bank sitting and saying, no, it is not fraud. It's not sending false. These are not false trades. These are real trades that are subject to being executed. Many of the trades here were executed. And even as late as 2004, post-Dodd-Frank, 2014, post-Dodd-Frank, we have the CFTC in its filing to a federal court in the Wilson case saying that spoofing is a disruptive practice. It's prohibited. But it does not sound in fraud. That's the language of the CFTC. So certainly a reasonable trader back in 2009, 2000 could share the same view that the CFTC expresses in 2014 that this conduct of trading with an intent to cancel, although it's a live trade, does not sound in fraud. A reasonably objective person could hold the same view as the CME, as the CFTC, and certainly as the Fifth Circuit and Raleigh. You can't imprison somebody today based on when they're holding the same views as is being expressed by the regulator and by the Fifth Circuit and Bank. And I think it's also, so all these positive things would have told the trader that this is not fraudulent conduct. But you also have to look at the dog that's not barking here. If it had been- Isn't that directly contrary to what we found in COSIA? Because in COSIA, and we are quoting from Dodd-Frank, we held that Dodd-Frank provided fair notice and afforded due process. Despite that argument. So it sounds like you're- That was a different due process argument about the terms of the Dodd-Frank statute. But the same terms that you're relying on now. It was a direct challenge to the Dodd-Frank statute. But you're now trying to use this information about Dodd-Frank and these communications about Dodd-Frank to bolster your other argument. And we rejected those in COSIA. Respectfully, Your Honor, that was about the different language and construction of what the elements were of that disruptive practice. And here, Mr. Pisillo was found not guilty of those charges. And that's a different charge. The question, is it fraud or not? Do you want to reserve the rest of your time for rebuttal? Thank you, Your Honor. All right, thank you. We'll next move to Mr. Allen. May it please the Court, David Allen on behalf of Appellant Edward Basis. The District Court erred below when it admitted lay opinion testimony from representatives of the CME and bank compliance officers to offer the opinion that rules and policies, which on their face said nothing about the conduct at issue, prohibited broad practices like fraud, manipulation, and so forth. He admitted opinion testimony that those policies and rules were understood at the time to prohibit the defendant's trading. And that testimony should never have been admitted because there was no basis to connect those interpretations to either the appellant's state of mind at the time or to market participants generally and what they understood to be conveyed by orders on the CME. As you know, there were two critical questions at trial. Whether orders on the CME carried the charged implied representation, whether there was a sufficient market understanding to give rise to that implied representation, and two, whether the appellants knew prior to Dodd-Frank, prior to the CME's rule on the issue, whether they knew that real tradable orders conveyed false information to the market simply because they didn't want them to be executed. And the challenge testimony was critical to the government's attempt to answer both those questions. The government's now attempting to simply, frankly, walk away from the case that was actually presented to the jury, but it really can't do so. The government stated itself pre-trial below when we challenged the CME witness testimony that the CME representative's interpretation of Rule 432 would quote-unquote eviscerate the defendant's defense that their orders did not convey the charged implied representation. That on opposition to our Rule 29 motion, they again said that that testimony allowed the jury to conclude that that charged implied representation was carried by the CME orders. And again, on closing, and this is worth hearing in full, the government argued this conduct is quote obviously wrong and was never allowed because Mr. Snigowski, that's the CME representative, explained that spoofing is prohibited and always has been by the CME rule against engaging in fraud and acting in bad faith. That's Rule 432, end quote. Now, after making all those arguments and those statements below, the government tries to argue here that Rule 432 was not really the quote-unquote predicate for the defendant's convictions. But that's simply not true. The government argues that instead the predicate was the false statement. But the basis for the government's theory below that these orders, if there was anything false about these orders, was entirely based on Rule 432, its interpretation that was offered. Mr. Allen, why wouldn't the jury instruction given by the court address your argument? Were the court specifically instructed then that just a violation of these rules alone is not sufficient to convict them of any of the charges here, that this is really an intent issue? So I think there's two separate issues. So there's the question of intent, and the jury instruction did instruct that a simple rule violation is alone not sufficient to establish fraudulent intent. But Rule 432 was used for two… But more than that, it wasn't sufficient to commit, to prove that they had committed the fraud. So beyond just intent. Correct, correct. So I agree that instruction was given, but the entire premise of the supposed false statement here was the market understanding that was based on Rule 432. So yes, the government didn't argue… Was it the market understanding or the defendant's individual standing? Understanding based upon training that they had received. So two separate issues there. So one, does the implied representation exist? And that is a question that turned on, well, what did market participants writ large understand to be represented by these orders? And that was fundamentally based on Rule 432. If you look at the testimony of the alleged victim representatives, they based their understanding on the quote-unquote rules and so forth. And then the government tried to close that loop by putting forward the CME witness to explain, well, this is the rule, and this is what we thought it meant, and therefore you can find this implied representation. Then there's the second issue of the defendant's fraudulent intent, which Rule 432, again, factored into, despite the lack of evidence that anybody was aware that the CME interpreted Rule 432 to prohibit this conduct. And that also goes to the compliance officer testimony. As Your Honor mentioned, the compliance policies prohibiting manipulation were presented to the jury. On their face said nothing about spoofing, nothing about intent to trade, bona fide orders. But the government was allowed to put on representatives from these banks who weren't in positions at the time to know what was communicated to traders. Admittedly, they testified. They could not testify to what was communicated to the appellants. But they were nonetheless allowed to testify that this prohibition on manipulation was understood by quote-unquote the banks to prohibit this conduct. And on that basis, the government argued throughout trial they conflated these, frankly, distinct concepts between manipulation and fraud. And then, of course, these witnesses were subject to cross-examination. So I have not been through the whole trial record, but I can imagine there's a number of blows landed by attorneys on behalf of your client, Mr. Loeb's client, that would point out this distinction, correct? And then the jury receives that distinction, and they make their determination with regard to the verdict. Absolutely true. The compliance officers were crossed. It was brought out that one of them didn't even work at the bank at the relevant period and so forth. I agree. But I don't think it should be left to the defense to try to counter this evidence when it should not have been admitted in the first place. What you had was you're presenting two purported authorities, compliance officers at two of the biggest banks in the world, to come in and basically choose up sides. They say, yeah, we support the government's theory here. But there was no evidentiary basis for the jury to infer that the appellants shared that understanding. Okay. Did you want to reserve the rest of your time for rebuttal?  Thank you, Your Honor. Very good. Thank you, Mr. Allen. We're now going to move to counsel for the appellee, Mr. Lehrman. May it please the Court, Dan Lehrman for the United States. I'd like to start very briefly with one minute on sufficiency and then move on to the notice argument, because I think sufficiency is kind of the threshold argument here, and the notice argument follows on to that somewhat. It is undisputed that the defendants placed orders on the opposite side of the commodities market with the intent to cancel, and that is the exact conduct held to be fraudulent in Chinoo. And on appeal, the defendants do not dispute that they, in fact, engaged in the same conduct. So their only response on sufficiency is that the indictment alleged that they did not want the trades to execute. Judge St. Eve, as you noted, the indictment did, in fact, allege numerous times in numerous places that they placed the orders with the intent to cancel. It repeatedly called that the false statement, the misleading statement, the fraudulent statement. So that claim is without merit as a factual matter. I also wanted to make the point that the cases they cite for that proposition, Sterone, Likedom, and Adams, those are all constructive amendment cases, and so the language they cite from that are cases that go to the question whether, by virtue of the evidence at trial and instructions from the jury, the indictment was constructively amended at trial. For sufficiency, it's black-letter law that the only question is whether there is evidence such that any reasonable juror can find guilt beyond a reasonable doubt. But while you're on the indictment... Excuse me? I said while you're on the indictment, the appellants do take this one paragraph, actually wanted to trade the fraudulent orders when, in fact, they did not want to do so. So there is that one paragraph in this multi-page indictment. Why did the government replace this language between the second and third superseding indictment?  I don't know why they went from willing to want. I will say I do think it's true that they also did not want these trades to occur. I think in many ways want and intend to have very similar meanings. I think if you intend, if you say that you want to kill someone and then push them into the L tracks, a jury can infer that you intended to kill the person. So I don't think there's a ton of daylight between them, and I think we're kind of dancing on the head of the pin here. The main point is that that's not the only paragraph that uses the term misrepresentation. The fraud statute talks about false statements or representations. The overarching purpose of the conspiracy was to send materially false and misleading information that indicated increased supply and demand. That's paragraph four. Then you have all the other paragraphs that we quoted in our brief that talk about how the definition of the fraudulent order was placing orders that they intended to cancel to convey a false signal of supply and demand. And they're briefing below at both the motion to dismiss stage and the Rule 29 stage. They invoke that very same definition of fraudulent orders, and the argument was that as a matter of law, it is not fraudulent to place orders with the intent to cancel. They didn't make this want versus intent argument until after Chenew because Chenew squarely forecloses this argument, as Judge Brennan mentioned. But turning to the fair notice challenge, this is an as-applied challenge. It is still relevant, and we don't concede that we changed our mind in any respect, that this court held in Chenew that spoofing is a quintessential misrepresentation within the meaning of the fraud statutes. And Judge St-Yves, that is the question for purposes of fair notice. This is an as-applied challenge. So the question is you look to the facts of this offense, and the facts here are placing orders with the intent to cancel in order to send a false signal of supply and demand. Any reasonable trader would know that that is fraud, and the jury in fact found that they placed these orders with a specific intent to mislead. They therefore knew that it was misleading to do this. Their overarching argument is once again that they were not on notice that it was fraudulent to place orders that you didn't want to cancel, but that's just a rehash of their sufficiency argument in two ways. One is, as I just explained, the offense conduct here is placing orders with the intent to cancel, so whether they also knew that you couldn't place them wanting to cancel is beside the point. What's your specific response to what Mr. Loeb has said about what a reasonable trader knew in 2009, so pre-Dodd-Frank, and then also based on the CME guidance, the letters from the CFTC about what sounds in fraud, what doesn't? What's your specific response to those items? My specific response is that changes the actual – my threshold response, and then I'll turn to your questions. That changes the threshold inquiry here. The jury – the indictment alleged and the jury found that they placed orders with the intent to cancel in order to send a misleading signal. That is fraud, and it has been fraud for 150 years. So the question is not yet whether or not they have specific evidence that a particular rule said something was against the rules. They were not convicted of violating CME Rule 432. They were convicted of violating the fraud statute, so the only question is whether taking the facts of this case, a reasonable person would be unnoticed and it fell within the words of the statute as interpreted by case law. This court has long interpreted the case law to apply to implied misrepresentations, omissions, and half-truths, and that is the conduct at issue here. But if you look to the rules themselves and the bank policies, the rules themselves prohibit engaging in any conduct to manipulate the prices of exchange futures or options contracts or to upset the equilibrium of the market, creating a condition in which prices do not reflect fair market values. The Deutsche Bank and Bank of America policies prohibit placing orders to give a false impression of supply and demand. That is all exactly the conduct for which they were convicted here, and that is exactly the conduct for which they were convicted in Chinoo. If we talk about the CME letter, which again was not really evidence presented below in this context, all that said was that there needs to be some intent to mislead. Well, that was with respect to the CFTC, the statute of Dodd-Frank, but for purpose of fraud, we know there was intent to mislead because that's a requirement under the statute. So there's no inconsistency there. Another one of the letters from the CFTC even made clear that these new anti-spoofing rules were always unlawful under the statute. The cases are legion that the same conduct could be criminal under multiple statutes. Kosher held that it was criminal under both the fraud and the spoofing statute. This court's decision in Dial made clear that things like insider trading and pump-and-dump schemes are wire fraud before there were specific rules and regulations outlawing those schemes. The defendant's point on Kosher, though, is that we didn't specifically address the due process argument. It wasn't raised. I know it was raised below, but it wasn't raised on appeal. That is correct, and that is the big concession we made, that Kosher did not address that particular issue. Nor did Chinoo. Or Chinoo. But it has always been the case that these types of misrepresentations are fraud. Dial made clear that even placing an order for the purpose of conveying a false signal of the bona fides of a trade could be fraud. So I think they had even at a lower level of granularity noticed that the conduct here was fraudulent. And to answer your question, again, there's not really any dispute. I believe they conceded that order placement signals an intent to trade. That's what all the rules went to, that there's a background assumption that they knew and that market participants knew that order placements were expected to be bona fide. There's no dispute that they placed these orders here with the intent to cancel, that is, orders that were not bona fide. I don't know if they agree with that at all. In fact, they make a point of teaching us that most orders end up being canceled. But you can understand some confusion or at least dismay here that if it was illegal all along, as the government contends, why don't we see any action on this until after Dodd-Frank? You know, the first prosecutions were kosher, and then we have Chanu and Worley, and all this happens after Dodd-Frank specifically defines spoofing. Where were the prosecutions long before this if it's been fraudulent from day one? Well, I believe the district court decisions address that particular argument. And what they made clear is that this is a new type of fraudulent conduct made possible by the advent of high-frequency and algorithmic trading. The chats here show their fraudulent intent and show that they knew they were misleading the market. When they talked about, quote, manipulating the market and, quote, effing the market and, quote, tricking the algos, what they're talking about is manipulating them into seeing a false signal of supply and demand. That didn't start until 2007, correct, the algorithm trading on the platform? Yeah, it was late in the history. It was late in 2007, I think. Yeah, so it's true. The fraud statutes have been around for hundreds of – 150 years. This particular conduct has not. But the cases make clear that for the notice question, Your Honor, the question is whether you're invoking a novel construction of the statute or applying it to novel conduct. Even if they're right that this is novel conduct to which it has not been applied, that doesn't mean you're invoking a novel construction of the conduct. The first person to do the Nigerian print scheme via email could still be prosecuted for fraud even if he was the first one to use email to do it. Is this distinction that we're discussing – does that account for the not guilty verdict for Mr. Bacy's on the spoofing count, count 20, I think? I mean, I can't speak, obviously, exactly to what Mr. – he was acquitted for on that count. It could be that. It could be that. I believe he made an argument below that those were trades from different accounts, so it's possible that the jury found that they lacked intent, the fraudulent intent, with respect to that one particular charge. But here there were multiple other alleged cases of spoofing for which there was abundant attempt. So, again, just on the notice, there is no reasonable dispute that the conduct here, which is placing misleading statements to the market, is fraudulent. It's not a tautology to say that. It's not a tautology just because something is correct. That has been the inquiry for as-applied vagueness challenges, and they don't point to any case in which the fraud statutes have been struck down for similar reasons. If I could turn now to the evidentiary issues. With respect to both the root testimony from the CME officials and the big testimony, I would, again, just point to the fact that there's little dispute that order placement signals an intent to trade. And that is largely the purpose for which these rules and regulations were introduced. I could read them again, but I think they make clear that orders should be placed as real orders and not orders that you intend to cancel. And that is the background assumption. But in any event, as Judge St. Eve made clear, the jury was instructed that this alone is not evidence of fraud, and they were not convicted for violating the rules. This was just regular custom and practice testimony. They can see that such testimony is generally admissible, and the testimony is plainly relevant. So their main critique is that there is no evidence from which a jury can infer that the defendants knew this. But as Judge Brennan said, they were cross-examined on what the market knew, what defendants knew, what they told defendants. So this is really a question of weight and not admissibility. But in any event, the district court did not abuse its discretion in concluding that the jury could make that inference. These were experienced commodities traders. The evidence showed that other traders had the exact same understanding of the rules. Petty and Twelves, the victims, and Lacan all testified that the CME rules prohibited the placement of orders with the intent to cancel. That shows that this wasn't some secret rule. This is regular custom and practice testimony, and it's testimony that they don't really dispute, because although they obviously dispute whether it referred to or alleged anything about spoofing in particular, this is a fraud case, and that just means you can't make a misrepresentation. And it was clear that the market would assume, and they knew, that this was a misrepresentation. Again, there was abundant other evidence of their intent to defraud, including the chat messages, where they expressly talked about manipulating and tricking the markets. Other witnesses had the same testimony. For the reasons I said, the rules themselves, both the bank rules and the market rules, talk about manipulating the market, talk about sending a false signal supplying demand, talk about changing the information about demand and pricing and moving markets. So this is all squarely within the scope of the conduct in any event. If there are no further questions, Your Honor, the government would ask to affirm. Thank you, Mr. Lerman. Mr. Loeb, I'm going to increase your rebuttal time to four minutes, and you may approach. So counsel kept referring to the fact there was false signals being made to the market, and that was well established that when you do that, you're committing fraud. But what he's not addressing is the fact that even after Dodd-Frank, the CME is saying that when you're trading with an intent to cancel, if the trades are live, they are not creating a false appearance of market debt. So there is no false signal, even according to the CME.  But they are saying, if you look at pages 61 and page 70 of the appendix, that it is not a false signal. The false signal theory is just incorrect. How does that square with what we held in both Chianu and Kassia, that spoofing is illegal even if the trades that they did not intend to execute are readily tradable? Again, the due process argument is a temporal one. So a trader post-Koshen, post-Chianu, those would be problematic. The question is, would a trader at the time who saw these CME letters saying there is no creation of a false appearance of market debt by these trades where you intend to cancel, if they knew the Radley decisions, that they would have a reasonable person who could have believed at the time, objectively believed, that this was not fraudulent conduct? The fact that this court in Chianu took a different position doesn't mean that it was clearly established at the time. Your Honor's question about the lack of enforcement or conviction is very telling here. If, in fact, this was always fraud and this was always prohibited conduct under the rules, you would have had some dog that barked here that explained it, even if it was only 2007 to 2011. But we have no trader that's disciplined, no trader that is warned, no trader that is sanctioned. We have no case, we have no administrative decision of people who are engaging in this conduct. And this conduct was prevalent. That's why the CFTC asked for it to be considered a disruptive practice and be prohibited by conduct. So it was out there in the marketplace, but no one is warned, no one is sanctioned, no one is disciplined. Moreover, the training materials they tried to bring in, they couldn't find any training materials from the period of time that says this is fraudulent conduct or this is prohibited conduct. It's very telling that post-Dodd-Frank, now you do have training materials. Once it is prohibited, you're telling the traders don't do this. Beforehand, as the CFTC says itself, even post-Dodd-Frank, no one considered this to be actions that were sound and a fraud. Post-Kosha, post-Chenew, that's a different world. But the question is can you imprison someone when they're trading at the time when the Fifth Circuit, the CFTC, and the CME is saying that you are not sending these false signals to the marketplace? My client, we were sentenced to a year and a day in prison for doing things that were not objectively considered illegal at the time, and they should not be in prison, Your Honor. And so as to the witness point, you keep going back to the facts and sufficiency. The fair notice argument is an objective legal argument. But to the extent you're going to look at they rely on these CME officials, that flies in the face of Farinella, where this court said you can't bring in officials years after the fact to tell the court and to tell the jury how the law should have been construed or how the rules should have been construed. But wasn't Farinella different? Because in Farinella, the witness's interpretation of the FDA rules is what was the basis for criminal liability. Here, the basis of criminal liability is not a violation of the CME rule. It's a violation of the fraud statutes. That is correct, but the basis of the fraud is the misrepresentation. The misrepresentation here is based on the act of placing a bid or an offer, and those bids and offers are defined by the CME rules, and those CME rules tell the marketplace what those mean. And so they brought in these witnesses and said, yes, these rules are telling the marketplace that they were going to trade, they wanted to trade, and that they weren't going to cancel. Of course, we know from the record and from the amicus brief, 90% of all trades are canceled, so that's a ridiculous proposition. But they brought in these witnesses, as my co-counsel said, to be devastating witnesses and say under the material misrepresentation is founded upon Rule 432, which the district court itself said as a matter of law is ambiguous. Thank you, Mr. Loeb. Thank you. We're now going to move to Mr. Allen for your rebuttal. First of all, the government said that the admissibility, the testimony of the CME witnesses and compliance officers is a question of admissibility, a question of weight rather than admissibility. That's not the case. Without any basis to infer that the defendants knew these interpretations that were being offered, it was simply irrelevant and it was extremely prejudicial to their defense. It's essentially conceded that there was no basis to infer that the defendants were aware of it. All they can point to, the government can point to, is that the appellants were employed at the banks at the time. That simply is not a fair basis to infer that they understood a post hoc interpretation offered by somebody who wasn't at the bank at the time a decade after the fact was something that they were aware of. The government also points to the testimony of the victim representatives and the government cooperator as an independently sufficient basis to sort of corroborate that the defendants understood this and that everybody in the market understood that there was this implied representation. That's not the case. If you look at what the victim representatives actually testified to, they were all over the map. They all testified that the basis of their understanding of what orders represented was the rules. When asked what those rules required, they couldn't point to Rule 432, but they said bona fide, intent to trade. It was extremely contested below. What does that mean? Does it mean willingness? Because there really was no basis for the jury to conclude that the defendants weren't willing to trade. And the government's now saying, well, you know, this worked in Chenew. There was similar testimony about bona fide intent to cancel. But Chenew is not this case. That's not how they proceeded below. And whether the court holds the government to the specific representation alleged in the indictment, wanting to trade or not, that's how the trial below proceeded. They argued to the jury repeatedly. They elicited testimony from the CME that Rule 432 required wanting to trade. The victim testimony didn't support that fact. The cooperator didn't support that interpretation. All they said was intent to trade. It was very much at issue whether intent to trade meant willingness or something else, as Mr. Loeb has articulated. Thank you very much. Thank you, Mr. Loeb. Thank you, Mr. Allen. Thank you, Mr. Lehrman. The case will be taken under revisement.